IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 28, 2025 Session[1]

## STATE OF TENNESSEE v. AMIR HASSAN SPEARS

**Appeal from the Criminal Court for Knox County**
**No. 114446      G. Scott Green, Judge**

_____

**No. E2024-01889-CCA-R3-CD**

_____

The Defendant, Amir Hassan Spears, appeals from his convictions for first degree felony murder, criminally negligent homicide, especially aggravated robbery, and aggravated assault. On appeal, he presents three issues for our review: (1) whether the evidence was insufficient to support the Defendant's convictions for failure to establish identity; (2) whether the State committed a *Brady* violation when it failed to disclose, prior to the close of the State's proof, the circumstances surrounding a victim's identification of the Defendant; and (3) whether trial counsel provided ineffective assistance by (i) failing to take appropriate action when this issue came to light at trial, and (ii) failing to adequately challenge testimony that the Defendant had concealed a long rifle inside his pants. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which JILL BARTEE AYERS and TOM GREENHOLTZ, JJ., joined.

Joshua D. Hedrick (at motion for new trial and on appeal), and Forrest L. Wallace (at trial), Knoxville, Tennessee, for the appellant, Amir Hassan Spears.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Charme P. Allen, District Attorney General; Hector I. Sanchez, G. Lawrence Dillon, and Jordan H. Murray, Assistant District Attorneys General, for the appellee, State of Tennessee.

_____

[1] Oral argument in this case was heard at the Duncan School of Law at Lincoln Memorial University in Knoxville. This panel wishes to express its gratitude to the University and our court staff for their efforts in bringing this project to fruition, as well as to both the students and attorneys that were present.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

This case involves allegations that, on January 28, 2018, the Defendant and four other individuals traveled to the home of Denise Stevens for the alleged purpose of purchasing marijuana from Deauntray Woods, who was present in the home with his friend, Hunain Rasheed.  Upon arrival, four of these individuals approached the residence, three of whom were armed, and began firing into the residence, wounding Mr. Woods and Mr. Rasheed, and killing Ms. Stevens.  After the shooting ceased, they took from the residence a backpack alleged to have contained $25,000 in cash, several ounces of marijuana, and an assault rifle.  The group, including two other individuals who had remained outside during the incident, then drove away from the scene.  Based upon his alleged participation in these events, on December 5, 2018, a Knox County grand jury indicted the Defendant, along with Elijah Bowman, with alternative counts of first degree felony murder and first degree premeditated murder of Ms. Stevens, two counts of attempted first degree murder of Mr. Woods and Mr. Rasheed, and three counts of especially aggravated robbery.

A four-day jury trial began on December 2, 2019, where the Defendant and codefendant Bowman were tried jointly.  The third individual alleged to have fired upon the victims, David Wright, Jr., was charged individually, and his criminal case was adjudicated in a separate proceeding.  He did not testify at trial.  Christian Rader Jones and Don Davis were identified as the two men who were allegedly present at Ms. Stevens' residence but remained outside during the incident.  They both testified against the Defendant and his codefendant.

### A.     Trial[2] and Sentencing

At trial, Mr. Woods testified that he and codefendant Bowman had known one another since childhood and that, on January 28, 2018, codefendant Bowman reached out to him, expressing a desire to purchase a large amount of marijuana.  After the two men agreed on a price, Mr. Woods provided the address of the house where he was staying, which belonged to his cousin, Ms. Stevens.  When codefendant Bowman arrived at the residence with Mr. Wright, Mr. Rasheed answered the door, let the two men inside the

---

[2] Although the proof at trial was voluminous, we have limited our factual recitation to that which is necessary to address the issues raised by the Defendant as to his convictions.  Further details appear in this court's opinion on the Defendant's codefendant's case, *State v. Bowman*, No. E2021-00614-CCA-R3-CD, 2022 WL 16736985, (Tenn. Crim. App. Nov. 7, 2022), *perm. app. denied* (Tenn. Jan. 23, 2025).

residence, and shut the door behind them. Codefendant Bowman hugged Mr. Woods upon entering, and the two began talking in the living room, still in the presence of Mr. Rasheed and Mr. Wright. Shortly thereafter, Ms. Stevens came out of her bedroom, and Mr. Woods recalled that she "seemed real[ly] nervous and . . . worried." Ms. Stevens then asked the men in the living room, "Who is this walking up my driveway with this big a-- rifle[?]"

Mr. Woods recalled that he, Mr. Rasheed, codefendant Bowman, and Mr. Wright exchanged "blank looks . . . like [they] didn't know what was going on," and Mr. Rasheed went back to the front door and opened it. Through the open door, Mr. Woods saw the Defendant standing on the porch holding an assault rifle. The Defendant raised his weapon, pointed it at Mr. Rasheed's head, and fired one shot. Although this shot missed Mr. Rasheed, who began fleeing towards Ms. Stevens' bedroom, the Defendant entered the house and continued firing at Mr. Rasheed. Mr. Woods identified the Defendant in the courtroom as the person he saw standing in the doorway with the assault rifle who was "aiming down the barrel shooting rounds at [Mr. Rasheed]" after he began running away. Mr. Woods also asserted that a bag of some sort was wrapped around the middle of the Defendant's assault rifle.

Once the Defendant entered the residence, codefendant Bowman and Mr. Wright both produced handguns and shot Mr. Woods. After Mr. Woods fell to the ground, codefendant Bowman, Mr. Wright, and the Defendant turned their attention to the bedroom where Mr. Rasheed and Ms. Stevens were, and "started shooting through the [closed] door." When the gunfire ceased, Mr. Woods saw codefendant Bowman and Mr. Wright "grab the backpack and the [assault rifle] . . . that was on the couch," along with approximately eight ounces of marijuana, before they left the residence with the Defendant. Mr. Woods claimed ownership over the marijuana and the backpack, which he estimated contained $25,000 in cash, but he asserted that the assault rifle taken from the residence had belonged to Ms. Stevens.

After the three men left the residence, Mr. Woods went to the bedroom to check on Mr. Rasheed and Ms. Stevens, and he observed that both had suffered gunshot wounds. Mr. Rasheed stated that he had been "hit" and could not move, but Ms. Stevens was "mumbling . . . in pain" and unable to speak. At that point, Mr. Woods left the bedroom to check on Ms. Stevens' three minor children, all of whom were under the age of ten, and he found them unharmed in their bedrooms.

Importantly, Mr. Woods affirmed that, shortly after the shooting, he was shown a photographic lineup by law enforcement from which he positively identified the

Defendant, though he was unfamiliar with the Defendant previously. He likewise identified codefendant Bowman, and Mr. Wright through separate photographic lineups.

Mr. Rasheed testified consistently with Mr. Woods regarding the arrival of codefendant Bowman and Mr. Wright, and he also recalled Ms. Stevens asking about a man in her driveway with a rifle. When Mr. Rasheed opened the door of the residence the second time to "see what[ was] happening," he saw the barrel of a rifle pointed at him, and he turned and ran toward Ms. Stevens' bedroom as the first shot was fired at him. When he reached the bedroom doorway, Mr. Rasheed pushed Ms. Stevens inside, onto the floor, and he shut the door behind them. Ms. Stevens stood up and approached the door "when she thought the gunshots had ceased," but she was then hit by gunfire through the door and slid down the wall onto the floor. As Mr. Rasheed tried to go to her aid, he was also hit by a gunshot, and he crawled into the adjoining bathroom. All told, Mr. Rasheed "heard more than ten" gunshots, and he believed the person in the doorway with the assault rifle was the person who continued shooting at him because the shots came from that direction. Mr. Rasheed confirmed that he was "more focused on the barrel of the gun and running away" than he was on the shooter's face, so he was unable to identify the person with the rifle. He testified that he had never met the Defendant but that he knew Mr. Wright from an after-school program.

Mr. Woods and Mr. Rasheed were both hospitalized, treated, and released within a day, but Ms. Stevens died from the wounds she suffered in the shooting. Dr. William Oliver, the medical examiner who performed Ms. Stevens' autopsy, testified that she had sustained three gunshot wounds, but no projectiles were discovered inside her body.

Mr. Jones testified pursuant to an agreement with the State that he would "have immunity" in the case if he told "the truth and the whole truth." Mr. Jones recalled that he reached out to codefendant Bowman on January 28, 2018, because he wanted to buy some marijuana. He drove to the home of Mr. Davis, where codefendant Bowman was spending time with Mr. Davis and Mr. Wright, and he waited there while codefendant Bowman attempted to find someone who had marijuana to sell. Once codefendant Bowman succeeded, Mr. Jones drove all four of them to pick up the Defendant from another location. After picking up the Defendant, Mr. Jones followed the directions from codefendant Bowman's phone to the residence where he expected the sale to take place. Mr. Jones stated that, at that time, he was not aware of whether any of the occupants of his vehicle were armed.

Upon arrival, Mr. Jones remained in the vehicle along with the Defendant and Mr. Davis, and codefendant Bowman and Mr. Wright began to approach Ms. Stevens'

- 4 -

residence. When codefendant Bowman and Mr. Wright were approximately ten feet away from the front door, they "waved" back at the car for the Defendant and Mr. Davis to follow them. The Defendant and Mr. Davis exited the vehicle and began walking towards the other two men. As they did so, Mr. Wright and codefendant Bowman entered the residence, and Mr. Jones saw the Defendant "remove a rifle out of his pants." Mr. Jones then heard "four to six or so" gunshots and saw codefendant Bowman and Mr. Wright "run out [of] the house." Meanwhile, Mr. Davis and the Defendant "jump[ed] off the porch and they all ran back to the car." At that point, the Defendant still "had the rifle[-]looking weapon" he had drawn earlier, and Mr. Davis was carrying an assault rifle that had been handed to him by Mr. Wright when he came out of the residence. Mr. Jones drove the group back to Mr. Davis's residence, and he saw the other four men "go in a room" and begin dividing up several ounces of marijuana. Mr. Jones claimed that he left without receiving any of the marijuana.

On cross-examination by the Defendant's counsel, Mr. Jones stated that he could not recall whether the Defendant was "limping" or "walking funny" when he initially picked him up. Mr. Jones acknowledged that the Defendant walked in front of his car, which was a four-door Chrysler Sebring, but he "wasn't necessarily watching [the Defendant] every step of the way." Mr. Jones agreed that he "didn't notice anything irregular" about the way the Defendant was walking. Once the group arrived at the residence where the sale was expected to take place, Mr. Jones stayed in the car, but he was not "looking up the hill the whole time" while he waited for the others to return. Mr. Jones did not see the Defendant enter the residence, but he did recall seeing him on "the left side" of the porch after codefendant Bowman and Mr. Wright had gone inside.

Mr. Davis also testified under an "informal" agreement with the State, which he understood to mean that he would not be charged in connection with the case if he cooperated by testifying truthfully. He acknowledged that he had initially lied to law enforcement when he was interviewed, but he asserted that he eventually told the truth during that interview and that he was telling the truth in his trial testimony. Mr. Davis testified consistently with Mr. Jones regarding the events leading up to their arrival at Ms. Stevens' residence. Mr. Davis also recalled that, after codefendant Bowman and Mr. Wright got out of the vehicle and approached the residence, he and the Defendant followed to "make sure they were safe" during the expected drug transaction. As they were walking up the driveway, Mr. Davis saw the Defendant pull an assault rifle out of "[h]is pants." When Mr. Davis arrived at the steps leading up to the porch, he heard a gunshot and ran back to the car. The Defendant, who had been behind Mr. Davis, "stayed back" at the end of the driveway, but Mr. Davis did not see whether the Defendant went up to the house after he himself ran away.

On cross-examination by the Defendant's counsel, Mr. Davis affirmed that the Defendant pulled "a rifle that[ was] two and a half feet long" out of his pants, but he could not recall what kind of pants the Defendant was wearing. Mr. Davis also asserted that the Defendant was "nowhere near the front of the house" at the time that he heard the gunshot and ran away. Mr. Davis initially claimed that he had "never lost sight of" the Defendant during the incident, but he later asserted that the Defendant was the last person in the group to return to the car. Mr. Davis himself was the first person back inside the car, and "by the time [the Defendant] was coming down, I didn't see nothing because the windows [of the car were] tinted." He estimated that codefendant Bowman, Mr. Wright, and the Defendant were back in the car with him "five seconds" after everyone had exited the residence.

Knoxville Police Department Sergeant Brian Dalton testified as an expert in the field of forensic firearm and tool-mark identification. He assisted in the recovery of six nine-millimeter cartridge casings and five bullets or bullet fragments from the scene. Upon conducting a forensic analysis on four of the five bullets and the six shell casings, he concluded that at least two firearms were used. Sgt. Dalton further asserted that "[t]here were no cartridge cas[ing]s or projectiles that appeared to have been fired from [an assault rifle], nothing of that caliber," found at the scene. However, Sgt. Dalton opined that projectiles from an assault rifle could easily have passed through the interior and exterior walls of the residence.

Investigator Charles Lee, retired from the Knoxville Police Department, testified during the State's proof that he conducted interviews with the surviving victims, which included presenting them with photographic lineups. Investigator Lee was not cross-examined at that time. After the State rested its case-in-chief, the Defendant's counsel recalled Investigator Lee and asked him "when [the Defendant] became a suspect" in this case, as the proof had established that neither of the surviving victims had known him previously. Investigator Lee responded,

Initially, on [January] 28th at the hospital, [Mr. Woods] mentioned a possible first name, wasn't sure about the full name of the individual. He kind of assured me at that point that he was gonna be able to get that to me, you know, eventually. But, going to see him on [January] 29th after he had been released from the hospital, he had got—been getting some more information. He started naming actually people, but I think he was getting some of this information on social media and so forth, just things he had been hearing or what—you might want to consider it secondhand going around, but names had been surfaced. And like in many of our investigations, when that occurs,

- 6 -

many people are on social media, and once those names started surfacing to Mr. Woods, that's just how I took it, was that he started doing some research pulling up pictures of anyone, you know, underneath those names, Facebook type situations and—but he provided—whether it would be the—on [January] 29th or in between that and [February] 6th, I know he gave me the name[ of the Defendant].

On February 6, 2018, approximately one week after the shooting had taken place, Investigator Lee provided a photographic lineup to Mr. Woods, and Mr. Woods identified the Defendant therein.

During closing argument, the Defendant's counsel emphasized that there was no ballistic proof "about high powered rifle entry or exit wounds in Ms. Stevens[' body] or in the interior or exterior of that house." The Defendant's counsel likewise argued that the social media investigation undertaken by Mr. Woods, from which he identified the Defendant to law enforcement, made the later-presented photographic lineup itself "beyond suggestive" to the point that it became "fraudulent." Likewise, the Defendant's counsel argued that the witnesses' testimony largely did not agree with one another, and in some respects, was unbelievable:

From [the Defendant's] perspective, we have three, maybe four different explanations for where he was and what he was doing. I think of all the explanations, probably the most fantastic part was Mr. Davis and Mr. Jones saying that [the Defendant] pulled an AR-15 rifle out of his sweatpants as he walked up a muddy hill. These guys were sitting in this Sebring three deep in the back seat, a small sedan. Nobody—Mr. Jones and Mr. Davis said they didn't know anybody had any guns and then [the Defendant] gets out to go up to that house and all of a sudden, he pulls an AR-15 out of his sweatpants. Now, number one, if that's possible, I don't know how you do it without holding your hand on it without it being blatant[ly] obvious that you have a high powered rifle in your pants. I see the exhibit was taken out, so I'm not gonna pull it out amongst you guys, but you all saw the demonstration by the State's witnesses, you saw the firearm. It's not a handgun, I think that's pretty obvious. . . .

The Defendant's counsel also urged the jury to consider whether there had actually been "some agreement" amongst the individuals to commit these offenses or if "[i]t was just another day for everybody until things went sideways."

The trial court had previously found that Mr. Jones and Mr. Davis were not accomplices "as a matter of law," and it charged the jury accordingly during its final instructions:

An accomplice is a person who knowingly, voluntarily and with common intent with the principal offender unites with him or her in the commission of a crime. If a witness was an accomplice in the crime, then his or her testimony must be corroborated.

Corroborating evidence is that evidence entirely independent of the accomplice's testimony which taken by itself leads to the inference not only that a crime has been committed but also that the defendant was implicated in it. This independent corroborative testimony must also . . . include some fact or circumstance that affects the defendant's identity. Corroborative evidence may be direct or entirely circumstantial, and it need not be adequate in and of itself to support a conviction. It is sufficient if the corroborative evidence fairly and legitimately tends to connect the defendant with the crime charged. It is a question for the jury to determine whether an accomplice's testimony has been sufficiently corroborated.

In this case, it is a question for the jury to determine whether the witnesses, Don Davis and Christian Rader Jones, were accomplices within the crimes alleged within counts one through seven. If you find from the proof that the witness was an accomplice, then the defendant cannot be convicted upon the uncorroborated testimony of this witness. If you find that the witness was not an accomplice, then you will judge the weight to be given to his testimony just as you do that of any other witness in the case.

The case was then submitted to the jury.

Following deliberations, the Defendant was convicted of first degree felony murder; criminally negligent homicide, as a lesser included offense of first degree premeditated murder; two counts of especially aggravated robbery; and one count of aggravated assault, as a lesser included offense of especially aggravated robbery. *See* Tenn. Code Ann. §§ 39-13-102, -202(a)(2), -212, -403. The Defendant was acquitted of both charges of attempted first degree murder.

Upon the return of the jury's verdict, the trial court imposed a sentence of life imprisonment for the Defendant's first degree felony murder conviction, into which his

conviction for criminally negligent homicide merged, and ordered the completion of a presentence investigation report prior to imposing sentences on the remaining counts. At a subsequent sentencing hearing, the trial court imposed sentences of twenty years for both of the Defendant's especially aggravated robbery convictions and a sentence of six years for his aggravated assault conviction, all of which were ordered to run concurrently with one another and the sentence of life imprisonment already imposed. The Defendant filed a motion for new trial following his sentencing hearing.

B.      Motion for New Trial

On May 3, 2021, the Defendant's counsel (hereinafter, "trial counsel") moved to withdraw from representation, alleging that "counsel is a witness to a claim [the] Defendant could raise within the motion for new trial and thus cannot continue to represent [the] Defendant." The trial court granted the motion and appointed successor counsel on May 12, 2021. On September 30, 2024, successor counsel filed an amended motion for new trial, which alleged ineffective assistance of counsel and included a report from Dr. Jeffrey Neuschatz, a proffered expert in eyewitness identification. On December 12, 2024, the same date that the motion was heard, successor counsel filed an additional amended motion for new trial, therein alleging that the State improperly withheld favorable evidence prior to trial, which constituted a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

At the hearing, Dr. Neuschatz testified that he had been conducting research in the area of eyewitness identification for nearly thirty years, and he was declared an expert in this field without objection. Dr. Neuschatz reviewed the discovery and transcripts of the proceedings in this case, and he prepared a report containing his opinions, which was received as an exhibit. He noted that he had been "involved in working on questions about human memory" for his entire career, which spanned more than thirty years.

Dr. Neuschatz first generally described the suggestibility of human memory, particularly involving events that happened quickly, as including a tendency for individuals to "fill in the gaps of things that [were] left out" based on what "seem[ed] most plausible in the situation." He explained that, "when we collect other information, that makes us think what we are thinking was wrong, [and] we can then replace some of that information from later. The information we're replacing can be accurate or it may not [be]." He further asserted that memory may become inaccurate, or merely less accurate, when the person is distracted, cannot see clearly, or the situation is otherwise a stressful one. Exposure time, or how quickly the remembered event itself happened, was also a factor: "The less time you have to see it, study it, rehearse it, the harder it is going to be to remember it accurately. And that goes for face recognition and identification as well." Finally, Dr. Neuschatz

- 9 -

explained that the "retention interval," or the length of time between the event remembered and the "test" of that memory, affected the accuracy of recollection: "The longer the retention interval, the harder it is to remember things accurately because there [is] other information that can interfere with the memories and then there could be decay in that you just forget the information or lose the information over the retention interval."

Regarding the identification at issue in this case, Dr. Neuschatz recounted that Mr. Woods originally said, while in the hospital and being interviewed by law enforcement, that he had not seen the face of the person at the door.[3] "Later on, after [Mr. Woods] goes through Facebook and subsequently makes an identification, in his trial testimony he changes that to say . . . he did see the person briefly." Based upon this inconsistency, Dr. Neuschatz opined that Mr. Woods had "changed his memory to accommodate subsequent information." Dr. Neuschatz expressed doubt about the accuracy of the identification, even though Mr. Woods also identified the Defendant at trial:

> [T]he reason [the Defendant] was developed as a suspect was because Mr. Woods went on social media and found his picture. So that was a post-event search of a picture and now it becomes unclear what Mr. Woods is identifying. Right? Is he identifying the picture that he saw on social media or the person that he saw during the event? And in his mind or the way memory works is you wouldn't be able to know which one you're actually choosing.
>
> . . . .
>
> . . . [O]nce you make an identification of someone, you are committed to that identification, and you will choose the person again. So what we do in the research is we give people like a mugshot or like a mug book, and they pick someone out of the mug book who's not the person who committed the crime. Then we put that person in a lineup and people pick them again because once they make the first choice of the person, they're committed to doing it again because they think that's the person doing the crime.

Dr. Neuschatz further related that he was unsure, based on his review of the materials provided to him, whether "best practices" were otherwise followed in conducting this photographic lineup.

_____

[3] The record indicates that this interview was recorded, and we surmise that Dr. Neuschatz reviewed it when he received the discovery in this case. However, Mr. Woods's trial testimony did not include this fact, and the recorded interview was not made an exhibit or otherwise included in the record on appeal.

On cross-examination, Dr. Neuschatz admitted that "one possible explanation for an eyewitness identifying somebody is that the eyewitness [had] an accurate memory of the culprit." He further acknowledged that everything he had identified as conditions that could lead to an inaccurate identification could not exclude the possibility of an accurate identification in any case, nor could he say with certainty that an inaccurate identification occurred in this case. Dr. Neuschatz agreed that it was possible for a witness to remain consistent with a previously made identification because it was correct, and although he could identify factors that might impact a witness's memory, he could not testify "as to whether or not those factors actually did have an impact on the witness's memory." Dr. Neuschatz had not questioned Mr. Woods about his identification of the Defendant.

Trial counsel testified at the hearing that the defense theory he pursued at trial was that "it was just a drug deal, the [Defendant] was there, [but he] did not have any intention of committing any violent acts, didn't have a gun, and then things went sideways at [the] drug deal." Because there was a "big difference" between the Defendant being at the door with a rifle and just standing in the yard without a weapon, trial counsel agreed that it was "fair" to characterize the identification of the Defendant as the man with the rifle as the "core" of the whole defense. Trial counsel characterized the information about the circumstances of Mr. Woods's identification of the Defendant as "a surprising development in the middle of [the] trial." Upon questioning from the trial court regarding whether he requested a mistrial, trial counsel admitted that he had not, but he agreed that if he could do it over again, he would have "requested some relief, a mistrial or a continuance or some opportunity" to investigate the issue further. Trial counsel likewise asserted that, had he known the circumstances of the identification before the trial, he would have used that information to attack its reliability. Trial counsel also agreed that he would have consulted an expert, such as Dr. Neuschatz, because having such an expert on the subject would have bolstered his argument. Finally, trial counsel asserted that his failure to do so was not a strategic decision.

Trial counsel recalled that he cross-examined Mr. Davis and Mr. Jones about their claim that the Defendant pulled an assault rifle out of his pants, and he "tried to make a big deal out of that, how ridiculous it sounded." He acknowledged that an assault rifle was displayed to the jury in the case but, although he did not "know physically what [he] did during closing argument," he did not believe that he "demonstrate[d] for the jury what it would be like to have something that size in [the Defendant's] pants." A "tracing" of an assault rifle and a photograph of the Defendant holding the tracing against his body were received as exhibits to the hearing.

- 11 -

At the conclusion of the hearing, the trial court denied the Defendant's motion for new trial and indicated that it would enter "a very brief perfunctory order" reflecting its ruling, which was filed later that same day.

On October 30, 2025, this court ordered a limited remand "for the trial court to enter a written order . . . containing its findings of fact and conclusions of law related to the Defendant's *Brady* and ineffectiveness claims" as described in the remand order. The trial court's order, received January 21, 2026, included the following:

> This Court finds that the evidence simply does not support the allegation that trial counsel failed to adequately challenge the claim that the [Defendant] concealed the rifle within the vehicle. Trial counsel testified that he raised this issue before the jury, and argued this point in closing argument. This Court accredits trial counsel's testimony. Moreover, a person of common intelligence would understand that such a claim was subject to challenge irrespective of whether or not defense counsel argued the same. Trial counsel litigated the issue, [and] the fact that another attorney may have argued the issue in a different manner does not add constitutional dimension to the equation.
>
> This Court, further, finds that the defendant has failed to establish both prongs of the *Strickland* analysis with respect to the identification of the defendant by [Mr.] Woods. Even if this Court were to find that counsel should have employed an identification expert, this defendant has failed to establish how the absence of this expert prejudices him to the extent that the outcome of his trial should be called into question. This Court has carefully reviewed the testimony of [Dr. Jeffrey] Neuschatz and trial counsel. Based upon this testimony, and the record as a whole, the defendant has failed to establish any ground upon which this defendant could have suppressed either identification of the defendant by Mr. Woods. The in[-]court identification of this defendant by Mr. Woods is significant evidence, but within the context of this record, the failure to impeach the same with expert proof does not render the result of the trial unreliable. This Court included an instruction which directed the jury on the proper method to undertake when evaluating possible accomplice testimony. Moreover, this defendant never asserted that he was not present at the home where the homicide occurred, rather the argument centered upon his lack of involvement/knowledge of the crimes. Given the fact that two credible witnesses who knew this defendant (and who rode to the crime scene with him) place him at the scene of the crimes, the

addition of an expert to impeach Mr. Woods['s] identification would not have changed the result.

As significantly, there is no evidence that the jury found that Don Davis and/or Christian Jones were accomplices. If the jury was not convinced that either, or both, were an accomplice[,] the testimony of neither witness required corroboration, and accordingly, either identification was legally sufficient to sustain the verdict (irrespective of Mr. Wood[s]'s identification). Moreover, both Mr. Woods and Mr. Rasheed testified that a third person was seen by the deceased victim who asked: "who is walking up my driveway with this big a—rifle?" It is uncontradicted that this exclamation was made after co-defendants Wright and Bowman were already within the home.

Accordingly, to sustain the defendant's position this Court must find as fact that Christian Jones and Don Davis were both accomplices who shared a common intent to commit a robbery with Mr. Bowman and Mr. Wright; that all four men included this defendant who knew nothing of the plot; that a robbery and homicide took place; and that this defendant was falsely implicated because [Mr.] Woods incorrectly identified the one person who was not a part of the plot, but who everyone agrees was present. The evidence within this record, especially when considered in conjunction with the accomplice instruction, does not support this conclusion.

(Footnotes omitted).

As to the alleged *Brady* violation, the trial court reiterated its previous oral finding that no such violation occurred. The trial court further noted that the circumstances surrounding Mr. Woods's identification "might have more significance" absent the testimony of Mr. Jones and Mr. Davis, but the disclosure of those circumstances would not have impacted the admissibility of the identification itself. "Once that identification took place, no matter how the same was impeached, the evidence was legally sufficient to convict this defendant even if the[] jury believed Mr. Jones and Mr. Davis were accomplices."

The case is now before us for review.

## II. ANALYSIS

On appeal, the Defendant contends that the evidence was insufficient to support his convictions; the State failed to disclose favorable evidence, which constituted a *Brady* violation; and trial counsel provided ineffective assistance in two respects during the Defendant's trial. The State responds that the Defendant has not met his burden of establishing that he is entitled to relief on any of these claims. We will address each of these issues in turn.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions, on the basis of establishing his identity, because the testimony of Mr. Davis and Mr. Jones required independent corroboration under the then-effective accomplice corroboration rule, and there was none. In this regard, the Defendant points out that there was no physical evidence connecting him to the offenses and that Mr. Woods's identification of him as the man with the rifle was "not a strong identification." He also generally argues that the testimony from Mr. Davis and Mr. Jones strained belief. The State responds that the evidence was sufficient to support the Defendant's convictions.

### 1. General Sufficiency Law and Standard of Review

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e). However, this court evaluates the sufficiency of the evidence by considering all of the evidence presented to the jury, including any evidence alleged to have been improperly admitted. *State v. McLawhorn*, 636 S.W.3d 210, 237 (Tenn. Crim. App. 2020) (first citing *State v. Longstreet*, 619 S.W.2d

97, 99-101 (Tenn. 1981); and then citing *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008)).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id.* (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The law provides this deference to the jury's verdict because

> [t]he jury and the [t]rial [j]udge saw the witnesses face to face, heard them testify, and observed their demeanor on the stand, and were in much better position than we are, to determine the weight to be given their testimony. The 'human atmosphere of the trial and the totality of the evidence' before the court below cannot be reproduced in an appellate court, which sees only the written record[.]

*Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963) (quoting *Folk v. Folk*, 355 S.W.2d 634, 637 (Tenn. 1962)). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

### 2. Identity and Accomplice Corroboration

The identity of the perpetrator is an essential element of any crime. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also Miller*, 638 S.W.3d at 158-59.

Regarding the requirement of accomplice corroboration, under Tennessee law as it stood at the time of the Defendant's trial, the Defendant's convictions could not be "solely

- 15 -

based upon the uncorroborated testimony of one or more accomplices." *State v. Thomas*, 687 S.W.3d 223, 239 (Tenn. 2024)[4] (quoting *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). An accomplice is one who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). The test for determining whether a witness is an accomplice is whether the witness could be indicted for the same offense as the defendant. *See State v. Green*, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the testimony must be corroborated. *Lawson*, 794 S.W.2d at 369. On the other hand, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. *Id.*; *see Green*, 915 S.W.2d at 831-32.

To corroborate the testimony of an accomplice, there "must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it[.]" *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)). This corroboration must consist of some fact or circumstance which establishes the identity of the defendant. *Id.* It "may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction[.]" *Id.* The requirements of the accomplice corroboration rule are met "if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." *Id.* The necessary corroboration needs only be slight. *Bigbee*, 885 S.W.2d at 803. Whether sufficient corroboration exists is for the jury to determine. *Shaw*, 37 S.W.3d at 903 (quoting *Bigbee*, 885 S.W.2d at 803).

### 3. Analysis

While the Defendant concedes that there was "ample evidence" that a crime was committed, he contends that this lack of physical evidence—even when combined with the accomplice testimony of Mr. Jones and Mr. Davis alongside Mr. Woods's "unreliable, tainted" identification of him as the rifleman—demonstrates that the proof was insufficient to establish his identity "as the person involved in committing the crime." However, the

---

[4] Recently, in *Thomas*, the Tennessee Supreme Court abolished the court-made rule that accomplice testimony must be independently corroborated to sustain a criminal conviction, but it did so in a prospective manner only, applying to cases tried after March 18, 2024. 687 S.W.3d at 242-43.

Defendant's arguments conflate various tenets of sufficiency of the evidence review as performed by an appellate court.

Importantly, we begin by focusing on the oft-repeated tenet of sufficiency law that criminal convictions may be sustained by the testimony of a victim alone. *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'" (first quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); and then citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981))). Despite this, the Defendant asserts that Mr. Woods's "testimony was susceptible to serious and legitimate criticism based on the circumstances of the identification and the likelihood, supported by scientific evidence, that the identification was unreliable, tainted by factors relating to the event itself and tainted by post-event suggestion." The Defendant also notes the alleged *Brady* violation in this section of his argument, observing that the defense "was without the ability to adequately challenge the circumstances of the identification" through the use of an eyewitness identification expert.

Regardless of any alleged *Brady* violation, when an appellate court reviews whether the evidence admitted is legally sufficient to support a conviction, all evidence is reviewed, even evidence that the court determines was improperly admitted. *Gilley*, 297 S.W.3d at 763 (citing *Longstreet*, 619 S.W.2d at 100-01); *see also State v. Lozano*, No. M2017-01250-CCA-R3-CD, 2018 WL 4275919, at *4 (Tenn. Crim. App. Sep. 7, 2018) (holding that the evidence was sufficient to support a conviction for simple possession of marijuana by considering all of the evidence admitted at trial despite the defendant's alleging the State failed to establish "an unbroken chain of custody"). This is true notwithstanding the reason the evidence was erroneously admitted amounts to the denial of a defendant's constitutional rights. *State v. Franklin*, 585 S.W.3d 431, 457 (Tenn. Crim. App. 2019). Thus, even if the Defendant's *Brady* argument entitled him to relief, which, for reasons discussed below, we conclude that it does not, we would nonetheless review the victim's identification, as presented to the jury, in our sufficiency analysis.

Viewed in the light most favorable to the State, the evidence established that Mr. Jones and Mr. Davis—both of whom knew the Defendant personally—saw the Defendant outside the residence holding an assault rifle. Mr. Woods—the victim of one of the Defendant's convictions for especially aggravated robbery—saw the Defendant at the front door holding an assault rifle and firing that assault rifle into the residence, and he identified the Defendant both from a photographic lineup during the investigation and in court during the trial. The jury heard testimony that an apparatus was used to catch the shell casings as they were ejected from the rifle, and that rounds from this rifle could "easily" have passed

through the walls of the residence. Additionally, Mr. Jones testified that the Defendant and the other three men divided up the marijuana taken from the scene of the crime after they returned to Mr. Davis's residence.

Investigator Lee was recalled by the defense and testified to the circumstances surrounding Mr. Woods's ultimate identification of the Defendant as the individual at the door with the assault rifle. According to Investigator Lee, shortly after the shooting, he spoke with Mr. Woods at the hospital, and at that time, Mr. Woods could not fully identify any of the suspects. When Investigator Lee spoke with Mr. Woods the following day after Mr. Woods's release from the hospital, Mr. Woods indicated that names had "surfaced" as he had "been getting some more information" from "social media and so forth." Somewhere between January 29 and February 6, Mr. Woods provided Investigator Lee with the Defendant's name. Thereafter, Investigator Lee compiled a photographic lineup from which Mr. Woods identified the Defendant. Here, through the questioning of Investigator Lee, the jury was informed of the circumstances leading up to Mr. Woods's identification of the Defendant.

Moreover, we note that Mr. Woods, as another individual present inside the living room of the residence, but not the object of the initial recipient of the Defendant's gunfire, seemingly had a clear view of the person at the front door. To that end, Mr. Woods's identification of the Defendant as the individual at the door holding the assault rifle and firing at Mr. Rasheed was specific and unwavering, though he was unfamiliar with the Defendant personally and did not know his name at first. Any issue with trial counsel's failure to present Dr. Neuschatz as an expert in eyewitness identification does not affect the sufficiency of the evidence as it relates to Mr. Woods's identification of the Defendant, it being instead a matter of ineffective assistance of counsel, which is addressed below and does not entitle the Defendant relief.

Also, during closing argument, defense counsel noted the social media investigation undertaken by Mr. Woods following the shooting, and he challenged the photographic lineup as "beyond suggestive" to the point it became "fraudulent." Thus, issues with Mr. Woods's identification were raised by the defense and brought to the attention of the jury. And despite the Defendant's protestations to the contrary, physical evidence is not required in addition to a victim's identification testimony. *See, e.g.*, *Bonds*, 189 S.W.3d at 256 ("[C]orroboration of a victim's testimony by physical evidence is not required for a jury conviction to be upheld on appeal."); *State v. Moss*, No. W2018-00038-CCA-R3-CD, 2018 WL 4600903, at *5 (Tenn. Crim. App. Sep. 25, 2018) (holding that while no physical evidence linked the Defendant to the crime, sufficient evidence that included the victim's testimony, supported his conviction). "A conviction is not undermined by a lack of

[physical] evidence if there is legally sufficient evidence of guilt otherwise." *See State v. Hart*, 676 S.W.3d 103, 109 (Tenn. Crim. App. 2023) (noting such in the context of DNA and fingerprint evidence). "Indeed, the victim's testimony requires no corroboration to sustain a conviction." *State v. Enoch*, No. W2023-01032-CCA-R3-CD, 2024 WL 3261421, at *3 (Tenn. Crim. App. July 1, 2024), *no perm. app. filed*.

Nonetheless, as for the Defendant's argument that the lack of ballistic evidence affects the credibility of Mr. Woods's identification, the State presented both lay and expert witness testimony explaining what led to lack of ballistic evidence in this case, from which a reasonable juror could infer that no such ballistic evidence was needed to support the State's theory of the case beyond a reasonable doubt. *See Grace*, 493 S.W.2d at 476 (noting that a guilty verdict accredits the testimony of the State's witnesses); *cf. State v. Davidson*, 509 S.W.3d 156, 207 (Tenn. 2016) (noting that the jury is permitted to make reasonable inferences based on a ballistics expert's testimony). Defense counsel noted the absence of ballistics evidence during closing argument. However, witness credibility, including the reliability of a victim's identification, was a matter for the jury's discretion. *See, e.g.*, *State v. Harbison*, No. E2015-02170-CCA-R3-CD, 2016 WL 4925632, at *4 (Tenn. Crim. App. Sep. 14, 2016) ("The victim's testimony that the Defendant was the shooter is sufficient to establish the Defendant's identify as the perpetrator, and witness credibility and any conflicts in the testimony were resolved by the jury in favor of the State.").

Finally, regarding the Defendant's accomplice corroboration argument, as noted above, when the evidence is unclear, it becomes a question of fact for the jury to determine whether the witness is an accomplice and, if so, whether there is corroborating evidence to support the witness's testimony. *See Lawson*, 794 S.W.2d at 369; *Green*, 915 S.W.2d at 831-32. The trial court in this case determined that Mr. Jones and Mr. Davis were not accomplices as a matter of law, left that factual determination to the jury, and charged the jury accordingly. Importantly, the Defendant did not raise any issue with this jury instruction in his motion for new trial and does not challenge this jury instruction on appeal. *See* Tenn. R. App. P. 3(e) (stating that an issue regarding jury instructions granted or refused must be raised in the motion for a new trial, or it will be treated as waived); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *Gilley*, 297 S.W.3d at 762 ("The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal.").

Still, even if the jury determined that Mr. Jones and Mr. Davis were accomplices, there was sufficient corroboration of their testimony. *See, e.g.*, *State v. Rowden*, No. M2023-00262-CCA-R3-CD, 2024 WL 512481, at *11 (Tenn. Crim. App. Feb. 9, 2024)

(noting that the testimony of a witness who drove the defendant to the scene of the crime was sufficiently corroborated by other proof at trial even if she was deemed to have been an accomplice). While Mr. Jones and Mr. Davis testified differently regarding the Defendant's location during the events, both men indicated that the Defendant removed a long assault rifle from his pants as he approached the house. Mr. Jones testified that the Defendant was on "the left side" of the porch after codefendant Bowman and Mr. Wright had gone inside. Mr. Woods, one of the victims, placed the Defendant at the front door in possession of an assault rifle. Moreover, Mr. Rasheed affirmed that the person at the front door with the assault rifle began the gunfire.

As for the Defendant's challenge to the credibility of the variance in the accounts by Mr. Jones and Mr. Davis, we note that the jury heard testimony that these two men received leniency from the State in exchange for their truthful testimony against the Defendant at trial. And, while their stories differed somewhat, they were both familiar with the Defendant personally and testified that they saw the Defendant outside the residence holding an assault rifle before hearing shots fired. Both men were cross-examined extensively about their claim that they did not see the assault rifle at any point prior to their arrival at Ms. Stevens' residence. During closing argument, defense counsel cited the inconsistencies in their stories and the fantastical nature of their claim regarding the appearance of the assault rifle. Again, any issue with the credibility of Mr. Jones and Mr. Davis was a matter for the jury's determination, which we will not disturb on appeal. *See, e.g.*, *State v. Henry*, No. W2006-00344-CCA-R3-CD, 2008 WL 450459, at *3 (Tenn. Crim. App. Feb. 19, 2008) (determining that the evidence was sufficient because the inconsistencies in the witnesses' testimony did not negate the eyewitness identification from the victims, which was also corroborated by the testimony of an accomplice).

In conclusion, we reiterate that Mr. Woods's identification of the Defendant as the man at the front door holding the rifle was sufficient, in and of itself, to support the Defendant's convictions in this case. Moreover, that eyewitness identification was sufficient to corroborate the testimony of Mr. Davis and Mr. Jones, if the jury found them to be accomplices. Finally, we note that Mr. Jones's testimony established that the Defendant almost immediately received a portion of the marijuana that had been taken from the residence. From all of this, the jury could infer that the Defendant was an active participant in these offenses. *See, e.g.*, *State v. Williams*, No. W2013-01194-CCA-R3-CD, 2014 WL 6609360, at *5 (Tenn. Crim. App. Nov. 21, 2014) (affirming the defendant's conviction for aggravated robbery when, in addition to other evidence, witness testimony established that the defendant and two other men "had split the money three ways," after

said witness agreed to lure the victims outside).  Accordingly, the Defendant's sufficiency argument does not entitle him to relief.

## B.      Alleged *Brady* Violation

The Defendant asserts on appeal that the State's failure to disclose the circumstances of the photographic lineup, including precisely how Mr. Woods identified him as the man with the rifle therefrom, was favorable evidence withheld in violation of *Brady*.  He contends that disclosure of such information would have led to "fruitful defense investigation" that could have been used to challenge the identification and attack the efficacy of law enforcement's investigation.  The State first notes that "this claim is possibly waived because no pleadings related to discovery are in the record."  The State then argues that this development of the proof at trial was a delayed disclosure, rather than a complete non-disclosure, and *Brady* therefore does not apply absent a showing of prejudice regarding the delay.  However, we need not determine whether this constituted a non-disclosure or delayed disclosure in order to dispose of this issue under *Brady*.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial.  U.S. Const. amend. XIV, § 1; Tenn. Const. art. I, § 8; *see State v. Rimmer*, 623 S.W.3d 235, 256 (Tenn. 2021).  The Fourteenth Amendment of the United States Constitution prohibits state governments from depriving any person "of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.  Similarly, article 1, section 8 of the Tennessee Constitution provides, "[N]o man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."  As a result, the prosecution has a constitutional duty to furnish a defendant with exculpatory evidence that raises a reasonable doubt as to the defendant's guilt, *United States v. Agurs*, 427 U.S. 97, 98 (1976), or upon request, provide evidence "material either to guilt or to punishment," *Brady*, 373 U.S. at 87.

In *Brady*, the United States Supreme Court held that any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial.  *State v. Marshall*, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992).  However, the State is not required to disclose information that the accused already possesses or is able to obtain or information that is not possessed by or under the control of the prosecution or another governmental

- 21 -

agency.  *Id.* at 233.  "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose. . . .  Delay only violates *Brady* when the delay itself causes prejudice."  *Thomas*, 687 S.W.3d at 253 (quoting *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994)).

To prove a *Brady* violation, a defendant must demonstrate all of the following: (1) the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material.  *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).  The defendant bears the burden of proving a *Brady* violation by a preponderance of the evidence.  *Id.*  Appellate courts review the lower court's "findings of fact, such as whether the defendant requested the information or whether the state withheld the information . . . de novo with a presumption that the findings are correct unless the evidence preponderates otherwise."  *Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).  "[C]onclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness."  *Id.*

"Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses."  *Johnson v. State*, 38 S.W.3d 52, 55-56 (Tenn. 2001).  Stated another way, evidence is favorable if it "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness."  *Id.* at 56-57 (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)).  Additionally, in *Johnson*, our supreme court cited with approval a Nevada case stating that evidence is favorable under *Brady* if "it provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation . . . or to bolster the defense case against prosecutorial attacks."  *Id.* (citing *Mazzan v. Warden*, 993 P.2d 25, 37 (Nev. 2000)).

Moreover, the evidence is deemed material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley*, 473 U.S. at 678).  There is a considerable difference between merely raising doubts and the creation of a "reasonable probability" that the trial's "result . . . would have been different" had the prosecutor made a timely disclosure of this evidence.  *See Bagley*, 473 U.S. at 682.

Concerning the first *Brady* factor, the Defendant makes no argument that the withheld information about the circumstances of Mr. Woods's identification amounted to obviously exculpatory evidence that the State was required to disclose even absent a discovery request.  *See Edgin*, 902 S.W.2d at 390; *see also United States v. Agurs*, 427 U.S. 97, 107 (1976) ("[I]f the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made.").  We will not engage in any discussion in this regard *sua sponte*.  *See* Tenn. R. App. P. 27(a); Tenn. Ct. Crim. App. R. 10(b).

Because the Defendant contends that the withheld information about the circumstances of the identification in this case was "favorable" to the defense, it is incumbent upon him to prove by a preponderance of the evidence that he requested the information.  *See Edgin*, 902 S.W.2d at 390.  In this regard, the Defendant admits in his appellate brief that "the technical record does not contain pleadings relating to discovery," but he, nonetheless, asserts that "it appears that discovery was requested and provided as trial counsel pled in his November 14, 2019 motion to continue that the State has provided a large volume of discovery including hundreds of pages of reports, photos, and other documents."  However, the simple fact that the State provided discovery materials does not necessarily equate to confirmation that a request by the Defendant was made.

To the contrary, the appellate record contains no indication that the Defendant ever requested information about the circumstances of Mr. Woods's identification of the Defendant, or further information on the photographic lineup, either by way of a discovery request or any other motion filed or litigated prior to trial.  *See Cason v. State*, 503 S.W.2d 206, 209 (Tenn. Crim. App. 1973) (noting that, in the absence of a defense request in the record, there is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case" (quoting *Moore v. Illinois*, 408 U.S. 786, 795 (1972))).  At the motion for new trial hearing, trial counsel was not asked whether he requested the information at issue, nor did he assert that such a request was ever made.  It is the duty of the appellant to prepare a record that conveys

a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis for the appeal. *See* Tenn. R. App. P. 24(b); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)). Furthermore, despite the State's argument regarding the inadequacy of the record, the Defendant did not move this court to supplement the record with any missing transcripts or documents. *See* Tenn. R. App. P. 24(e) (permitting correction or modification of the record); *State v. Rhoden*, 739 S.W.2d 6, 14-15 (Tenn. Crim. App. 1987) (noting that, when a defendant discovers a deficiency in the record, it is his responsibility to take steps to supplement the record or to show his inability to prepare the required supplementation). Because the Defendant cannot establish the first factor necessary to prove a *Brady* violation, we need not analyze this claim further. *See, e.g.*, *State v. Pollard*, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253, at *10 (Tenn. Crim. App. Sep. 17, 2012) (concluding that the defendant had not established two of the four *Brady* factors and declining to examine the other two).

## C.     Ineffective Assistance of Counsel

Although this issue is generally reserved for post-conviction proceedings, a defendant may raise ineffective assistance of counsel in a motion for new trial and have the issue considered on direct appeal. *See State v. Anderson*, 835 S.W.2d 600, 606-07 (Tenn. Crim. App. 1992). In such instances, the same protections and procedures apply at the appellate level as would in our review of this issue following a post-conviction proceeding. *See id.* at 607. Accordingly, the burden is on the defendant to prove allegations of fact by clear and convincing evidence. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial are reviewed under a de novo standard with no presumption of correctness. *Id.* at 457.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980); *Dellinger*, 279 S.W.3d at 293. When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the defendant to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). "Because a [defendant] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance

claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, a reviewing court need not address both *Strickland* components if a defendant makes an insufficient showing of one component. *Id.* (citing *Strickland*, 466 U.S. at 697). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," and reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. *Rhoden v. State*, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the defendant must establish "a reasonable probability that[,] but for counsel's errors[,] the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "That is, the [defendant] must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (citing *Burns*, 6 S.W.3d at 463).

1. Eyewitness Identification

The Defendant's first assertion on the issue of ineffective assistance of counsel stems from trial counsel's failure to move for a mistrial or continuance when the circumstances surrounding Mr. Woods's identification of the Defendant came to light, which in turn led to trial counsel "failing to engage an expert in eyewitness identification and challenge the eyewitness identification." The Defendant contends that this failure "introduces a possibility" that such expert testimony would have led to a more favorable outcome at trial. The State responds that: (1) even if this failure established trial counsel's deficiency, the Defendant cannot establish prejudice based on the purely general testimony

provided by the defense expert at the motion for new trial hearing; and (2) a "possibility" is insufficient to establish the "reasonable probability" of a different result, the latter of which is necessary to prove prejudice.

The Defendant claims only that it was possible the jury might have been swayed by the introduction of this expert testimony; however, as outlined above, more than a mere *possibility* of prejudice is required. Instead, *Strickland* requires a *reasonable probability*. *See Moore v. State*, 485 S.W.3d 411, 421 n.3 (Tenn. 2016) ("The term 'could' connotes a possibility, no matter how improbable; whereas, the *Strickland* prejudice prong requires a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding *would* have been different.'" (quoting *Strickland*, 466 U.S. at 694)). Even if trial counsel were deficient in failing to raise this possibility, the Defendant has, for the reasons that follow, failed to establish a reasonable probability that, but for this alleged deficiency, the result of his trial would have been different.

At the motion for new trial hearing, Dr. Neuschatz provided merely general—and often vague—testimony about the workings of human memory and the factors that may influence eyewitness identification. Although he opined that Mr. Woods's memory of the event had changed to accommodate subsequent information, Dr. Neuschatz arrived at this opinion without ever interacting with Mr. Woods about the circumstances of his recollection and identification of the Defendant. In fact, Dr. Neuschatz noted during his testimony that it was unclear whether Mr. Woods was identifying the person he saw at the door with the assault rifle or simply the person whose photograph he found on social media. While the lack of clarity on this point could have been remedied by questioning Mr. Woods himself about his identification of the Defendant, Mr. Woods was not called to testify at the motion for new trial hearing. Again, the Defendant bears the burden of proving his allegations of fact by clear and convincing evidence, which he has failed to do. *See Burns*, 6 S.W.3d at 461; Tenn. Code Ann. § 40-30-110(f).

Moreover, while Dr. Neuschatz identified conditions that could lead to an inaccurate identification, he could not exclude the possibility of an accurate identification in any case, nor could he say with certainty that an inaccurate identification occurred in this case. Because the testimony of Dr. Neuschatz left both possibilities intact, his expert testimony regarding eyewitness identification, standing alone, does not weigh in favor of establishing a "reasonable probability" that the result of the Defendant's trial *would* have been different had it been put before the jury. *See Strickland,* 466 U.S. at 694; *e.g., Clardy v. State*, No. M2017-01193-CCA-R3-PC, 2018 WL 5046032, at *6-7 (Tenn. Crim. App. Oct. 17, 2018) (noting that the same expert's testimony provided the jury with more information to consider but failed to negate the eyewitness identification, and, therefore, failed to establish

prejudice). Here, we agree with the trial court that the proof adduced at the motion for new trial hearing was insufficient to establish prejudice.

## 2. Rifle Concealment

The Defendant's remaining assertion on the issue of ineffective assistance of counsel is that trial counsel failed to "adequately challenge" the testimony that the Defendant concealed a two-and-a-half-foot long assault rifle in his pants, when the witnesses also testified that the Defendant was walking normally and was able to get into the backseat of a small car containing two other "grown men," without anyone noticing the rifle. To this point, the Defendant contends that trial counsel should have provided the jury with further information by way of a demonstration to show the "absurdity" of this claim in a "plain and graphic manner." The State responds that trial counsel's performance did not fall below the objective standard of reasonableness when he chose to attack this claim through argument rather than by a demonstration.

Consistent with his testimony at the motion for new trial hearing, the record reflects that trial counsel cross-examined both Mr. Davis and Mr. Jones about the "fantastic" nature of their claim that the Defendant concealed an assault rifle within his pants, and he urged the jury during closing argument to reject the claim as absurd. In other words, trial counsel did challenge this evidence—repeatedly—by attacking its logical implications through cross-examination and argument. The trial court, in its order, accredited trial counsel's testimony and made a finding that, although "another attorney may have argued the issue in a different manner," the proof did not support the allegation that trial counsel's performance was inadequate.

We agree, and likewise conclude, that trial counsel's taking such an approach, rather than engaging in a visual demonstration, was a matter of strategy, not inadequacy; the record reflects that trial counsel was adequately prepared to address this point at trial and employed this tactic to do so. *See, e.g.*, *Haymon v. State*, No. W2005-01303-CCA-R3-PC, 2006 WL 2040434, at *10 (Tenn. Crim. App. July 20, 2006) (noting that the petitioner offered no support for a theory of ineffective assistance based upon trial counsel's failure to utilize visual aids and rejecting such a claim because trial counsel highlighted the inconsistences of the witness's statements on cross-examination). While it is possible that the jury might have responded more favorably to a different strategy, this is not a basis from which we could properly conclude that trial counsel was ineffective. *See Rhoden*, 816 S.W.2d at 60. When both strategies are objectively reasonable, as here, an attorney's decision to pursue one over the other does not fall outside "the wide range of reasonable professional assistance" merely because a different attorney might have—or even would

have—taken a different approach. *See Strickland*, 466 U.S. at 689. Accordingly, the Defendant has failed to establish that trial counsel performed deficiently in this respect.

### III. CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the trial court.

 s/Kyle A. Hixson
KYLE A. HIXSON, JUDGE